1  EILEEN M. DECKER
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   NATHANIEL B. WALKER (Cal. Bar No. 224473)
4  Assistant United States Attorney
   General Crimes Section
5     1200 United States Courthouse
      312 North Spring Street
6     Los Angeles, California 90012
      Telephone: (213) 894-0282
7     Facsimile: (213) 894-0141
      E-mail:   nathaniel.walker@usdoj.gov
8
9  Attorneys for Complainant
   UNITED STATES OF AMERICA

10                UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  IN THE MATTER OF THE          CR Misc. No.
    EXTRADITION OF
13                                COMPLAINT      15-1770M
    KENNETH WAYNE FROUDE,
14                                FOR ARREST WARRANT AND
    A Fugitive from the Government EXTRADITION; ORDER THEREON
15  of Canada.
                                  (UNDER SEAL)
16

17  TO:  Honorable Jacqueline Chooljian
         United States Magistrate Judge
18       Central District of California

19       I, Nathaniel B. Walker, being duly sworn, depose and state that

20  I am an Assistant United States Attorney for the Central District of

21  California and act for and on behalf of the Government of Canada

22  pursuant to the Extradition Treaty between the United States of

23  America and Canada signed on December 3, 1971 (the "Extradition

24  Treaty"), with respect to the fugitive, KENNETH WAYNE FROUDE (the

25  "fugitive" or "FROUDE").

26       In accordance with Title 18, United States Code, Section 3184, I

27  charge on information and belief as follows:

28

1.   That the Government of Canada has requested the extradition of the fugitive, a Canadian national.  A copy of that request for extradition, with related documents from the U.S. Department of State and the American Foreign Service (including a copy of the Extradition Treaty), is attached hereto as Exhibit 1.

2.   That I am informed through diplomatic channels that Canada seeks the extradition of the fugitive on two separate bases: (1) to return the fugitive to Canada to serve the remaining 3,409 days of his sentence under a Long Term Supervision Order ("LTSO") imposed on May 16, 2008, in furtherance of which, a "Warrant of Apprehension, Suspension and Recommitment to custody of Long Term Supervision" was issued on May 18, 2013; and (2) to stand trial for three charges of failing to comply with the LTSO.  Specifically, an information filed in the Ontario, Canada, Court of Justice on April 29, 2015, charges the fugitive with the following offenses, all in violation of § 753.3(1) of the Canadian Criminal Code: (1) failing to reside at a community correctional center or other facility approved by the Correctional Service of Canada ("CSC"); (2) failing to remain in Canada or within the territorial boundaries fixed by his parole supervisor; and (3) failing to "obey the law and keep the peace" as ordered in the LTSO.  A warrant for the arrest of the fugitive for those crimes was issued on April 29, 2015, by Justice of the Peace C.E. Hickling, of the Ontario Court of Justice.

3.   That the offenses for which the fugitive's extradition is sought are covered by Article 2 of the 1971 Extradition Treaty, as replaced by Article I of the Protocol Amending the Extradition Treaty with Canada of January 11, 1988, which entered into force on November 26, 1991 (the "1988 Protocol").

4.   That the extradition request contains various witness statements, copies of which are attached hereto as part of Exhibit 1, from which the following facts may reasonably be derived:

a.   Witness Karen Shai, Barrister and Solicitor, Counsel in the Crown Law Office - Criminal, Ministry of the Attorney General for the Province of Ontario, gave a statement under oath, before a commissioner of oaths for the province of Ontario, in Toronto, Ontario, Canada, on May 15, 2015.  The witness said as follows:

i.   On March 9, 2006, in the Superior Court of Justice, in London, Ontario, FROUDE was convicted by a superior court justice, sitting with a jury, on one count of breaking and entering and commission of a sexual assault, one count of sexual assault with a weapon, and one count of uttering threats to cause bodily harm.

ii.   On May 16, 2008, Superior Court Justice Rady sentenced FROUDE to ten years' imprisonment, declared FROUDE to be a long-term offender, and imposed the maximum duration of ten years for the LTSO.  A Canadian judge may designate an offender to be a long-term offender if the judge is satisfied that: (1) it would be appropriate to impose a sentence of imprisonment of two years or more for the offence for which the offender has been convicted; (2) there is a substantial risk that the offender will reoffend; and (3) there is a reasonable possibility of eventual control of the risk in the community.

iii.  FROUDE appealed his ten-year prison sentence to the Ontario Court of Appeal.  He did not appeal either the long-term offender designation, or the imposition or duration of the LTSO.  On April 21, 2009, the Ontario Court of Appeal dismissed the appeal.

iv.   In Canada, once an offender is convicted and sentenced to a term of imprisonment of two years or more, the CSC becomes responsible for the safe and humane custody and supervision of that offender.   The CSC not only oversees the administration of an offender's sentence while he is imprisoned, but also oversees the supervision of offenders who have been designated as long-term offenders and are released into the community under a LTSO.

v.   FROUDE was released from prison on November 12, 2010, and was then subject to the ten-year LTSO.   On March 25, 2011, he pleaded guilty to new charges in connection with breaching his LTSO by failing to report to a parole officer and by placing a telephone call to a female correctional officer at the prison from which he had been released in 2010.   FROUDE was sentenced to nineteen months' imprisonment for those offenses, and his ten-year LTSO was suspended while he served that sentence.

vi.   On April 12, 2012, FROUDE was released from prison on the condition that he reside at a community correctional center in Montreal.   Instead of remaining in Montreal, FROUDE entered the United States.   The U.S. Department of Homeland Security returned FROUDE to Canada on July 19, 2012.

vii. Upon eventual completion of his custodial sentence, FROUDE was again subject to the LTSO as of January 28, 2013.   On May 18, 2013, his whereabouts became unknown, and a "Warrant of Apprehension, Suspension and Recommitment to custody of Long Term Supervision" was issued, providing for his arrest, to enforce his service of the 3,409 days remaining under the LTSO.   This warrant remains outstanding.

1          viii.     On April 29, 2015, Justice of the Peace C.E.

2    Hickling issued an arrest warrant for FROUDE for failing to comply

3    with the LTSO.  On April 30, 2015, Justice Tranmer of the Superior

4    Court of Justice endorsed the arrest warrant as executable throughout

5    Canada.  This warrant also remains outstanding.

6          ix.  Canada seeks the extradition of FROUDE to enforce

7    the balance of 3,409 days remaining to serve on his LTSO, and for

8    prosecution on three charges of failing to comply with the LTSO.  If

9    extradited to Canada, FROUDE will be tried on the new criminal

10   charges together.  The charges carry a maximum sentence of ten years'

11   imprisonment.

12         b.  Witness Lisa Manson, National Manager, Sentence

13   Management for the CSC, gave a statement under oath, before a

14   commissioner of oaths for the province of Ontario, in Ottowa,

15   Ontario, Canada, on May 19, 2015.  The witness said as follows:

16         i.  On November 12, 2010, FROUDE began serving his

17   ten-year supervisory sentence under the LTSO.  The LTSO requires,

18   among other things, that FROUDE: (1) reside at a community

19   correctional center or a community-based residential facility

20   approved by the CSC; (2) remain at all times in Canada within the

21   territorial boundaries fixed by his parole supervisor; and (3) obey

22   the law and keep the peace.

23         ii.  After re-incarceration for prior violations of

24   the LTSO, FROUDE was released from a federal penitentiary on January

25   2, 2013.  On January 28, 2013, FROUDE resumed his service of the

26   LTSO at the Portsmouth Community Correctional Center ("PCCC"), in the

27   City of Kingston, Ontario, Canada.

28

1           iii. On Friday, May 17, 2013, Commissionaire Dan

2   Laurie was on duty at the PCCC.   At approximately 11:30 p.m.,

3   Commissionaire Laurie conducted a routine security inspection of the

4   facility.   Commissionaire Laurie saw FROUDE between approximately

5   11:30 p.m. and 11:45 p.m. in the kitchen area of Unit 8.   At 12:00

6   a.m. all exterior doors of the center were locked and alarmed, and

7   remained so until 6:00 a.m. Saturday, May 18, 2013.   Between 12:00

8   a.m. and 6:00 a.m. on Saturday, May 18, 2013, Commissionaire Laurie

9   and Commissionaire Rodger Corcoran conducted four routine security

10  checks in order to ensure that each of the residents was accounted

11  for in his room.   It appeared to the commissionaires that FROUDE was

12  asleep in his bed in Unit 8, Room C.

13          iv.   On May 18, 2013, at approximately 11:30 a.m.,

14  Parole Officer Sandi Desjardins received an anonymous text message

15  from a PCCC resident advising that FROUDE had absconded the previous

16  night.   Upon receipt of this information, Commissionaire Robert Arter

17  checked to see if FROUDE was in Unit 8, Room C.   Commissionaire Arter

18  looked through the small window in the door and knocked.   When he did

19  not get a response, he unlocked the door and walked over to the bed.

20  He saw that a comforter and a shirt had been arranged in the bed to

21  make it appear that FROUDE was asleep in the bed.   Most of FROUDE's

22  belongings were gone, including his television and stereo.

23  Commissionaire Arter checked the rest of the unit in an effort to

24  locate FROUDE.   Commissionaire Arter then checked the entire facility

25  and surrounding property, but was unable to locate FROUDE.

26          v.   FROUDE has still not served the entirety of the

27  ten-year LTSO.   The LTSO does not expire until September 22, 2022.

28  FROUDE has 3,409 days remaining to serve on his LTSO.

5.    That the fugitive is in the Central District of California and is, therefore, within the jurisdiction of this court.  On September 21, 2015, Deputy U.S. Marshal Luis Flores informed me that he has located the fugitive in Gardena, California, within the Central District of California, based on photographic and other identifying information provided by Canadian authorities and the Gardena Police Department, and is prepared to arrest the fugitive, if so authorized by this court.

6.    That FROUDE, a citizen of Canada, is described in the sworn affidavit of Lisa Manson as being a fair-skinned male of Native American descent, who was born on June 28, 1968, is 180 centimeters tall and weighs approximately 69 kilograms, has brown hair and brown eyes, and is believed to be residing at 15802 Venus Lane, Apartment 62, Gardena, California, 90249.

WHEREUPON, complainant requests that a warrant be issued, based on probable cause, pursuant to Title 18, United States Code, Section 3184, for the arrest of KENNETH WAYNE FROUDE; that KENNETH WAYNE FROUDE be brought before this Court and the evidence of criminality heard; that if on such hearing this Court deems the evidence sufficient under the provisions of the Extradition Treaty to sustain the charge, the Court certify the same to the Secretary of State in order that a warrant may issue for the surrender of KENNETH WAYNE FROUDE to the appropriate authorities of the requesting state, Canada, according to the Extradition Treaty; and that this Court take such other actions as this Court is required to take under the

//

//

1  provisions of the Extradition Treaty and the laws of the United
2  States to meet the obligations of the Extradition Treaty.
3  DATED: This 23 rd day of September, 2015, at Los Angeles, California.

4                          Respectfully submitted,

5                          EILEEN M. DECKER
6                          United States Attorney

7                          LAWRENCE S. MIDDLETON
                           Assistant United States Attorney
8                          Chief, Criminal Division

9                                    /S/

10                         NATHANIEL B. WALKER
                           Assistant United States Attorney

11                         Attorneys for Complainant
12                         UNITED STATES OF AMERICA

13  Subscribed and sworn to before
    me this 23rd day of September 2015.
14

15        JACQUELINE CHOOLJIAN

16  UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF ANNA CAVNAR

I, Anna Cavnar, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser, Department of State, Washington, D.C. This office has responsibility for extradition requests within the Department of State, and I am charged with the extradition case of Kenneth Wayne Froude. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. In accordance with the provisions of the extradition treaty in full force and effect between the United States and Canada, the Canadian Embassy has submitted Diplomatic Note No. 2264, dated May 27, 2015, formally requesting the extradition of Kenneth Wayne Froude. A copy of the diplomatic note is attached to this declaration.

3. The relevant and applicable treaty provisions in full force and effect between the United States and Canada are found in the Extradition Treaty between the United States of America and Canada of December 3, 1971, which entered into force on March 22, 1976 (TIAS 8237) (the "1971 Treaty"), the Protocol Amending the Extradition Treaty with Canada of January 11, 1988, which entered into force on November 26, 1991 (the "1988 Protocol"), and the Second Protocol Amending the Extradition Treaty with Canada of January 12, 2001, which entered into force on April 30, 2003 (the "2001 Protocol"). Copies of the Treaty and the Protocols are attached to this declaration.

4. In accordance with Article 17 of the 1971 Treaty, the Government of the United States provides legal representation in its courts for Canada in its extradition requests, and Canada provides legal representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are extraditable offenses pursuant to Article 2 of the 1971 Treaty, as replaced by Article I of the 1988 Protocol. Article 2 of the 1971

15051041-2

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

That Anna Cavnar, whose name is subscribed to the document hereunto annexed, was at subscribing the same Attorney-Adviser, Office of the Legal Adviser, Department of State, of America, and that full faith and credit are due to her acts as such.

*ertificate is not valid if it is removed or altered in any way whatsoever*



In testimony whereof, I, John F. Kerry, Secretary of State , have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this thirteenth day of August, 2015.

*Issued p      to CHXIV, S
Sept. 15,       1 Stat. 68-6
USC 265       SC 2651a; 5
301; 28        733 et. seq.; 8
1443(f);       14 Federal Ru
Civil Proc*

                                              Secretary of State

By _____

                        Assistant Authentication Officer,
                             Department of State

-2-

Treaty, as replaced by Article I of the 1988 Protocol, provides that extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Canada and the United States by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

6. The documents submitted by the Government of Canada in support of its extradition request were certified on May 29, 2015, by Bruce A. Heyman, Ambassador of the United States of America in Ottawa, in accordance with Title 18, United States Code, Section 3190. Mr. Heyman, at the time of his certification, was the principal diplomatic officer of the United States in Canada.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 13, 2015.

ANNA CAVNAR

Attachments:

1. Copy of Note
2. Copy of Treaty and Protocols



**Canadian Embassy**          **Ambassade du Canada**

2015 JUN -2  A 9: 37

DEPARTMENT OF STATE

Note No. 2264

The Embassy of Canada presents its compliments to the Department of State and has the honour to request the extradition of Kenneth Wayne FROUDE, a Canadian and U.S. citizen with Native Status under the Jay Treaty, born on June 28, 1968.

The subject is described as being 180 cm in height; weighs 69 kg; brown eyes, brown hair and a fair complexion.

A Photograph of the person sought accompanies the supporting extradition documents.

Extradition is sought for Mr. Froude to stand trial for the alleged offences:

- Three charges of failing to comply with a Long Term Supervision Order contrary to section 753.3(1) of the *Criminal Code*.

Extradition is also sought for enforcement of a sentence for:

- 3409 days remaining to be served on the Long Term Supervision Order that accompanied a 30 month sentence imposed on one count of Break and Enter and Commit Sexual Assault contrary to section 348(1) (b) of the *Criminal Code*; one count of Utter a Threat to cause Bodily Harm, contrary to section 264.1(2)

.../2

-2-

of the *Criminal Code*; and one count of Sexual Assault Using a Weapon, contrary to section 272(2) of the *Criminal Code*.

A Warrant for Arrest was issued by Justice of the Peace, C.E. Hickling on April 29, 2015, in the City of Kingston, Ontario.

A Warrant of Apprehension, Suspension and Recommitment to Custody of Long Term Supervision was issued by Nathalie Pageau on May 18, 2013 in the City of Ottawa, Ontario.

There is no statute of limitations in respect of the offences for which the person sought stands charged and in respect of the enforcement of a Long Term Supervision Order.

The last Known Location of the Accused is 15802 Venus Lane, Apartment 62, Gardena, California.

The Prosecuting Attorney is Karen Shai, Crown Counsel Crown Law Office - Criminal, telephone: (416) 326-4556.

The Investigating Officer is Lisa Manson, National Manager Sentence Management for the Correctional Service of Canada telephone: (613) 415-6362

The Embassy of Canada avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.



WASHINGTON, D.C.

May 27, 2015

| 107TH CONGRESS 2d Session | SENATE | TREATY DOC. 107–11 |
|---|---|---|

## SECOND PROTOCOL AMENDING EXTRADITION TREATY WITH CANADA

———

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA, SIGNED AT OTTAWA ON JANUARY 12, 2001



JULY 11, 2002.—The Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

———

U.S. GOVERNMENT PRINTING OFFICE

99–118                    WASHINGTON : 2002



# LETTER OF TRANSMITTAL

THE WHITE HOUSE, *July 11, 2002.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Second Protocol Amending the Treaty on Extradition Between the Government of the United States of America and the Government of Canada, as amended, signed at Ottawa on January 12, 2001. In addition, I transmit, for the information of the Senate, the report of the Department of State with respect to the Second Protocol. As the report explains, the Second Protocol will not require implementing legislation.

The Second Protocol amends the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988.

The Second Protocol, upon entry into force, will enhance cooperation between the law enforcement communities of both nations. The Second Protocol incorporates into the U.S.-Canada Extradition Treaty a provision on temporary surrender of persons that is a standard provision in more recent U.S. bilateral extradition treaties. It also provides for new authentication requirements of documentary evidence, which should streamline the processing of extradition requests.

I recommend that the Senate give early and favorable consideration to the Second Protocol and give its advice and consent to ratification.

GEORGE W. BUSH.

(III)

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, May 31, 2002.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Second Protocol Amending the Treaty on Extradition Between the Government of the United States of America and the Government of Canada, signed at Ottawa on January 12, 2001 ("Second Protocol"). I recommend that the Second Protocol be transmitted to the Senate for its advice and consent to ratification.

The Second Protocol will strengthen the U.S.-Canada extradition relationship by incorporating a temporary surrender mechanism into the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988 ("Extradition Treaty"). The Second Protocol will also streamline the extradition process by modifying the Extradition Treaty's authentication requirements relating to the admissibility of documentary evidence.

A temporary surrender mechanism has become a standard provision in more recent U.S. bilateral extradition treaties. It allows a person who have been found extraditable to be temporarily surrendered to one State to stand trial while they are still serving sentences in the other State. Temporary surrender can be an important tool for use in cases where serious crimes have been committed in one country which might go unpunished if trial in that country were to be delayed for a long period while a sentence was being served for crimes committed in the other country. It enables sequential trials of individuals who have committed extraditable offenses in both countries at a time when witnesses and evidence to both crimes are more readily available.

Article 1 of the Second Protocol amends the Extradition Treaty to provide for a new Article 7bis, which will follow Article 7's existing provisions authorizing the State in receipt of an extradition request ("requested State") to delay surrender until after proceedings against a person in that State have been completed or the person's sentence in that State has been served.

New article 7bis(1) provides that if the requested State has granted an extradition request in accordance with the Treaty with respect to a person who already has been convicted and sentenced in the requested State, it may temporarily surrender the person to the requesting State for prosecution. It further provides that the courts of the requested State must not be divested by virtue of the temporary surrender of jurisdiction over any appeal or habeas cor-

(V)

VI

pus application relating to the conviction or sentence in the requested State.

Article 7bis(2) provides that the person surrendered pursuant to paragraph (1) must be kept in custody in the requesting State. It also provides that the person must be returned to the requested State within forty-five days after the conclusion of the proceedings for which the person's presence was required or at another time as specified by the requested State, in accordance with conditions determined by the Parties. This provision anticipates that authorities in the United States and Canada, which in some cases will include state-level authorities, will consult to determine appropriate conditions for the temporary surrender of an individual, including arrangements for the transfer and return of the prisoner, as well as any extraordinary matters that may be relevant, such as medical care requirements. Consistent with our normal extradition practice, any case-specific agreements or assurances relating to the temporary surrender would be concluded by the federal authorities on behalf of state authorities. Similar to the language in paragraph (1), Article 7bis(2) also provides that the transfer of the person back to the requested State will not divest the courts of the requesting State of jurisdiction over any appeal or habeas corpus application relating to the matter for which the prisoner was temporarily surrendered.

Article 7bis(3) provides that the time spent in custody in the requesting State may be credited to the sentence in the requested State. In the case of the United States, credit for time served by a person surrendered to Canadian authorities may differ among U.S. state and federal authorities.

Article 7bis(4) provides that the requested State can waive the return of the surrendered person in the event the person's sentence in the requested State expires during the temporary surrender period. Article 7bis(4) provides that in such cases the person's surrender shall be considered a "final surrender" under the Extradition Treaty.

Because temporary surrender is contingent on a grant of extradition, Article 7bis(5) provides that the requesting State does not have to make a further request for the extradition of a person who has been returned to the requested State after having been convicted and sentenced in the requesting State for the offense for which temporary surrender was granted.

Article 7bis(6) provides that a person who has been returned to the requested State, after having been convicted and sentenced during a temporary surrender, must be finally surrendered once the custodial portion of the person's sentence in the requested State has been completed or, if the requested State so specifies, at an earlier time. This provision contemplates that the requested State will finally surrender a person who has been released on parole or under other conditions. It also envisions that the requested State may choose to surrender the person at an earlier time.

Article 7bis(7) recognizes that there may be reasons not to proceed with final surrender even though the person was convicted and sentenced during a temporary surrender. Article 7bis(7) (a) provides that final surrender will not take place when the requesting State advises that it is no longer required because the sentence

VII

imposed in the requesting State has expired or for other reasons. Similarly, Article 7bis(7) (b) provides that the person will not be surrendered to the requesting State in the event the competent authority of the requested State revokes its original grant of extradition.

Article 2 of the Second Protocol will establish a new framework for the admissibility of documentary evidence in support of a request for extradition by replacing existing Article 10(2) of the Extradition Treaty.

Consistent with U.S. extradition law on the admissibility of documentation, new Article 10(2)(a) reiterates the existing requirement that, in the case of a request from Canada, documents be authenticated by an officer of the Department of Justice of Canada and certified by the principal diplomatic or consular office of the United States in Canada. Article 10(2)(b), however, changes existing requirements with respect to requests emanating from the United States, so as to take advantage of changes in Canadian law regarding the admissibility of extradition documents in Canadian courts. Specifically, Article 10(2)(b) eliminates the requirement that the United States have its documentary evidence in support of extradition requests to Canada authenticated by an officer of the U.S. Department of State and certified by the principal diplomatic or consular officer of Canada in the United States. Instead, Article 10(2) (b) streamlines the authentication process by allowing documents to be certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. When the person whose extradition is sought has already been convicted, documents supporting the U.S. request are to be certified by a judicial, prosecuting or correctional authority who can attest to the fact that the documents are accurate. These changes should simplify and thereby reduce the administrative burden of processing extradition requests by the United States.

New Article 10(2) (c) provides an alternative to subparagraphs (a) and (b), by providing that documents may also be certified or authenticated in any other manner accepted by the law of the requested State. This addition will enable both countries to take advantage of any changes to their applicable laws.

Article 3 of the Second Protocol addresses the relationship between the Second Protocol and the Extradition Treaty. Paragraph (1) provides that the Second Protocol will form an integral part of the Extradition Treaty. Paragraph (2) provides for retroactivity, noting that, notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, the Second Protocol will apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date. Finally, paragraph (3) provides that the Second Protocol is subject to ratification, and enters into force upon the exchange of instruments of ratification. The Second Protocol would terminate upon termination of the Extradition Treaty.

The Second Protocol does not require implementing legislation. A Technical Analysis explaining in detail the provisions of the Second Protocol is being prepared by the United States negotiating delegation, consisting of the Departments of State and Justice, and will

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNEMENT OF CANADA

Signed at Washington on December 3, 1971,
as amended by an Exchange of Notes at Washington on June 28 and July 9, 1974,
and by a Protocol signed at Ottawa on January 11, 1988

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND
THE GOVERNMENT OF CANADA (hereinafter "the Parties");

RECOGNIZING the close bilateral relationship which exists between them,
reflected in numerous instruments and mechanisms of legal cooperation;

COMMITTED to strengthening legal cooperation in the fight against crime;
and

DESIRING to make more effective the Extradition Treaty between the Parties,
signed at Washington on December 3, 1971 (hereinafter "the Extradition Treaty"), as
amended by an exchange of notes of June 28 and July 9, 1974, and the Protocol to the
Extradition Treaty between the Parties, signed at Ottawa on January 11, 1988
(hereinafter "the Protocol");

HAVE AGREED as follows:

ARTICLE 1

The Extradition Treaty is amended by adding the following after Article 7:

"Article 7 bis

1.      The requested State, after granting an extradition request made in accordance
with the Extradition Treaty, may temporarily surrender a person who has been
convicted and sentenced in the requested State, in order that the person sought may be
prosecuted in the requesting State. The temporary surrender of the person shall not
divest the Courts in the requested State of jurisdiction over any appeal or habeas corpus
application relating to the conviction or sentence that otherwise may be available under
the laws of the requested State.

(1)

2

2.      A person temporarily surrendered pursuant to paragraph 1 shall be kept in custody in the requesting State. The person shall be returned to the requested State within forty-five (45) days after the conclusion of the proceedings for which the person's presence was required in the requesting State or at another time as specified by the requested State, in accordance with conditions to be determined by the Parties for that purpose.   The return of the person to the requested State shall not divest the Courts in the requesting State of jurisdiction over any appeal or habeas corpus application that otherwise may be available under the laws of that State, in relation to the matter for which the person was temporarily surrendered.

3.      The period of time spent in custody in the requesting State may be credited to the sentence in the requested State.

4.      : When the sentence that the person was serving in the requested State expires during the temporary surrender, the requested State may waive the return of the person and the surrender will be considered to be a final surrender. A "final surrender" is a surrender of a person pursuant to this Treaty other than as provided for by this Article.

5.      Subject to paragraph 7, if a person temporarily surrendered and returned to the requested State has been sentenced to imprisonment in the requesting State for the offence for which the person was temporarily surrendered, the person shall be finally surrendered to the requesting State, in accordance with paragraph 6, without a further request for extradition.

6.      Final surrender shall take place when the person has finished serving the custodial portion of the sentence in the requested State, or at an earlier time specified by the requested State.

7.      Final surrender shall not take place when:

   (a)    the requesting State advises that final surrender is no longer required due to the expiration of the sentence imposed or for other reasons; or

   (b)    after the temporary surrender, the warrant or order for the final surrender of a person sought is revoked by the competent authority of the requested State."

## ARTICLE 2

Article 10(2) of the Extradition Treaty is deleted and replaced by the following text:

"(2)   The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when:

   (a)    in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada;

3

(b)   in the case of a request emanating from the United States for a person who is sought for prosecution, they are certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction.   In the case of a request emanating from the United States for a person who is sought in connection with a conviction, the documents must be certified by a judicial, prosecuting or correctional authority who attests to the fact that the documents are accurate; or

(c)   they are certified or authenticated in any other manner accepted by the law of the requested State."

## ARTICLE 3

1.   This Second Protocol shall form an integral part of the Extradition Treaty.

2.   Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Second Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offence was committed before or after that date.

3.   This Second Protocol shall be subject to ratification, and shall enter into force upon the exchange of instruments of ratification.  It shall terminate upon termination of the Extradition Treaty.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Second Protocol.

DONE in duplicate at Ottawa   this Twelfth day of January 2001 in the English and French languages, the two texts being equally authentic.

FOR THE GOVERNMENT OF
THE UNITED STATES OF
AMERICA

FOR THE GOVERNMENT
OF CANADA

| 101st Congress 2d Session | SENATE | Treaty Doc. 101–17 |
| --- | --- | --- |

# PROTOCOL AMENDING THE EXTRADITION TREATY WITH CANADA

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE PROTOCOL SIGNED AT OTTAWA ON JANUARY 11, 1988, AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA, SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974



APRIL 24, 1990.—Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1990

39–118

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *April 24, 1990.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Protocol signed at Ottawa on January 11, 1988, amending the Treaty on Extradition Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. I transmit also, for the information of the Senate, the report of the Department of State with respect to the protocol.

The protocol amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974. It represents an important step in improving law enforcement cooperation and combatting terrorism by excluding from the scope of the political offense exception serious offenses typically committed by terrorists; e.g., murder, manslaughter, kidnapping, use of an explosive device capable of endangering life or causing grievous bodily harm, and attempt or conspiracy to commit the foregoing offenses.

The protocol also will help to improve implementation of the current extradition treaty in several other respects. Most significant, the protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, *inter alia,* parental child abduction and certain additional narcotics offenses will be covered by the new treaty.

I recommend that the Senate give early and favorable consideration to the protocol and give its advice and consent to ratification.

GEORGE BUSH.

(III)



## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, April 10, 1990.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Protocol amending the 1971 Extradition Treaty Between the United States of America and Canada, signed at Ottawa January 11, 1988. I recommend that the Protocol be transmitted to the Senate for advice and consent to ratification.

The Protocol supplements and amends the Extradition Treaty Between the United States and Canada, signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974 (27 U.S.T. 983; TIAS 8237). The Protocol would exclude specified crimes of violence, typically committed by terrorists, from the scope of the political offense exception to extradition. It therefore represents an important step toward improving law enforcement cooperation and countering the threat of international terrorism and other crimes of violence. In addition, the Protocol will help improve the implementation of the current Treaty in several other respects. Most significantly, the Protocol substitutes a dual criminality clause for the current list of extraditable offenses, so that, inter alia, parental child abduction and certain additional narcotics offenses will be covered.

Article 2 of the 1971 Extradition Treaty, as amended, which incorporates a Schedule of extraditable offenses, has been replaced in its entirety. Pursuant to the current Extradition Treaty, only crimes that are listed in the Schedule are considered extraditable offenses. As amended by Article I of the Protocol, Article 2 of the 1971 Treaty, as amended, adopts a dual criminality approach, which emphasizes extradition based on underlying criminal conduct rather than for a particular offense. A dual criminality clause permits extradition for any crime that is punishable in both countries by imprisonment or other detention for at least one year. Inclusion of a dual criminality clause, therefore, obviates the need to renegotiate or supplement the Treaty as offenses such as computer-related crimes or money laundering, become punishable under the laws of both states.

Article I of the Protocol replaces Article 2 of the 1971 Treaty and provides that an offense is extraditable notwithstanding that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States. This provision will allow the United States to request extradition for offenses including interstate and foreign travel or transportation in aid of racketeering enterprises

2

even though the Canadian laws do not include analogous jurisdictional elements for similar underlying criminal behavior. The new provision also stipulates that offenses that relate to taxation or revenue or that are of a "purely fiscal character" will be extraditable offenses.

Article II of the Protocol is a technical amendment, deleting the Schedule of extraditable offenses annexed to the 1971 Treaty, as amended, and incorporated by reference in Article 2.

Article III of the Protocol deletes Article 3 of the 1971 Treaty, in which a particularized definition of "territory," which was necessary at that time to cover certain types of hijacking offenses, is no longer necessary, as both the United States and Canada are parties to the Hague Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague December 16, 1970, and entered into force October 14, 1971, (Hijacking Convention) (22 U.S.T. 1641; TIAS 7192) and the Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, done at Montreal September 23, 1971, and entered into force January 26, 1973, (Sabotage Convention) (24 U.S.T. 564; TIAS 7570).

Article 3(3) of the 1971 Treaty is amended to give the Executive or other appropriate Authority the discretion to extradite fugitives when the requesting state has jurisdiction over an offense in a situation where the laws of the requested state would not provide for jurisdiction in similar circumstances.

Article IV of the Protocol replaces Article 4 of the 1971 Treaty and effectively limits the scope of the political offense exception. It specifies certain crimes which shall not be regarded as political offenses, including murder, manslaughter, malicious assault, kidnapping, specified explosives offenses, and conspiracy or attempt to commit any of the foregoing offenses.

In addition, Article IV of the Protocol includes a provision that excludes from the reach of the political offense exception any offense for which both the United States and Canada have an international treaty obligation to extradite the person or submit his case for prosecution; e.g., aircraft hijacking pursuant to the Hijacking Convention; aircraft sabotage pursuant to the Sabotage Convention; crimes against internationally-protected persons, including diplomats, under the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, done at New York December 14, 1973 (28 U.S.T. 1975; TIAS 8532); and hostage taking pursuant to the International Convention against the Taking of Hostages, done at New York on December 17, 1979. This exception will also extend to crimes similarly defined in future multilateral treaties.

Article V of the Protocol replaces Article 7 of the 1971 Extradition Treaty, which allows the Requested State to defer surrender of a fugitive being proceeded against or serving a sentence in its territory until the conclusion of the proceedings and the full execution of any punishment. Under the Protocol, the Requested State has the discretion to choose to extradite to the Requesting State a fugitive who is serving a prison sentence in the Requested State before the expiration of his sentence. This alternative of temporary surrender is routinely included in our modern extradition treaties.

3

Article VI of the Protocol replaces Article 11(3) of the current Treaty to extend the period of provisional arrest in the Requested State from forty-five days to sixty days, which is the time period most commonly provided under U.S. extradition treaties. The extension will allow prosecutors greater latitude in assembling extradition packages and in making necessary adjustments or additions to the documents.

Article VII of the Protocol amends the 1971 Treaty by adding a provision that establishes that, in cases where both states have jurisdiction to prosecute for an offense, the Executive Authority of the Requested State will consult with the Executive Authority of the Requesting State and make a decision whether to extradite the fugitive, or whether to submit the case to its competent authorities for the purpose of prosecution, after considering all relevant factors.

Article VIII of the Protocol provides that its provisions shall apply to any offense committed, any request made or any person found extraditable before or after the entry into force of the Protocol, but shall not apply to an offense committed before the Protocol enters into force if the offense in question was not an offense under the laws of both Contracting Parties at the time of its commission.

Article IX of the Protocol sets forth the procedures for ratification and entry into force.

I enclose, for the information of the Senate, an exchange of letters dated January 11, 1988, which restates that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters," is an extraditable offense under the 1971 Extradition Treaty.

The Department of Justice joins the Department of State in favoring transmission of this Protocol to the Senate at the earliest possible date.

Respectfully submitted,

JAMES W. BAKER III.

Enclosure: As stated.

THE SECRETARY OF STATE,
*Washington, January 11, 1988.*

Hon. JOE CLARK, P.C., M.P.,
*Secretary of State for External Affairs of Canada, Ottawa.*

DEAR MR. MINISTER: I refer to the Protocol Amending the Treaty on Extradition between the United States and Canada we signed today and have the honor to address to you the following.

The United States and Canada recognize that the transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters", is an extraditable offense under the United States-Canada Extradition Treaty.

Where a person has been charged with or convicted of such an offense in Canada and is found within the jurisdiction of the United States, the United States agrees, upon request, to commence extradition proceedings against such a person pursuant to the Treaty in order that the person may be returned to Canada.

4

The United States will use its best efforts to honor Canadian requests for testimony, information, or other assistance pertaining to such abductions.

Canada and the United States agree to cooperate to deter such transborder abductions. To assist in achieving that purpose, the United States will continue to exert its best efforts to inform those engaged in business as bail bondsmen or bounty hunters and other interested parties of the positions set forth in this exchange of letters.

Canada and the United States agree to consult promptly concerning any case of transborder abduction involving bounty hunters which might arise in the future. The purpose of such consultations shall be to address matters relating to any such case, including any request by the Government of Canada for the return of the person so abducted. In the event of return, the Governments agree to cooperate to have the abducted person escorted to Canada and taken into custody at the border, pursuant to a request for provisional arrest, pending the outcome of extradition proceedings. For the purpose of these consultations, the principal law enforcement contact for the United States will be the Director of the Office of International Affairs of the Criminal Division of the Department of Justice.

I have the honor to propose that this letter and your reply constitute an understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Sincerely yours,

GEORGE P. SHULTZ.

OTTAWA, *January 11, 1988.*

JLA–0026.
Hon. GEORGE P. SHULTZ,
*Secretary of State of the United States of America.*

DEAR MR. SECRETARY: I have the honour to acknowledge receipt of your letter of today's date concerning transborder abduction of persons found in Canada to the United States of America by civilian agents of bail bonding companies, so-called "bounty hunters." I accept your proposal that your letter and this reply constitute an Understanding between our two Governments which is not intended to create or otherwise alter legal obligations for either Government nor to create or otherwise alter any rights or privileges for private parties.

Yours sincerely,

JOE CLARK.

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA SIGNED AT WASHINGTON ON DECEMBER 3, 1971, AS AMENDED BY AN EXCHANGE OF NOTES ON JUNE 28 AND JULY 9, 1974

The Government of the United States of America and the Government of Canada;

Desiring to make more effective the Extradition Treaty between the Contracting Parties, signed at Washington on December 3, 1971, as amended by the agreement effected by an Exchange of Notes on June 28 and July 9, 1974 (hereinafter referred to as "the Extradition Treaty");

Have agreed as follows:

## ARTICLE I

Article 2 of the Extradition Treaty is deleted and replaced by the following:

### "ARTICLE 2

"(1) Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment.

"(2) An offense is extraditable notwithstanding

"(i) that conduct such as interstate transportation or use of the mails or of other facilities affecting interstate or foreign commerce, required for the purpose of establishing jurisdiction, forms part of the offense in the United States, or

"(ii) that it relates to taxation or revenue or is one of a purely fiscal character."

## ARTICLE II

The SCHEDULE to the Extradition Treaty, as amended, is deleted.

## ARTICLE III

Paragraph (2) of Article 3 of the Extradition Treaty is deleted. Paragraph (3) of Article 3 of the Extradition Treaty is amended to read as follows:

"(2) When the offense for which extradition is requested was committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall grant extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances. If the laws in the requested State do not so provide, the executive

6

authority in the requested State may, in its discretion, grant extradition."

## ARTICLE IV

Paragraph (2) of Article 4 of the Extradition Treaty, as amended, is deleted and replaced by the following:

"(2) For the purpose of this Treaty, the following offenses shall be deemed not to be offenses within subparagraph (iii) of paragraph 1 of this Article:

"(i) An offense for which each Contracting Party has the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to its competent authorities for the purpose of prosecution;

"(ii) Murder, manslaughter or other culpable homicide, malicious wounding or inflicting grievous bodily harm;

"(iii) An offense involving kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

"(iv) An offense involving the placing or use of explosives, incendiaries or destructive devices or substances capable of endangering life or of causing grievous bodily harm or substantial property damage; and

"(v) An attempt or conspiracy to commit, or counselling the commission of, any of the foregoing offenses, or aiding or abetting a person who commits or attempts to commit such offenses."

## ARTICLE V

Article 7 of the Extradition Treaty is deleted and replaced by the following:

## "ARTICLE 7

"When the person sought is being proceeded against or is serving a sentence in the requested State for an offense other than that for which extradition is requested, the requested State may surrender the person sought or postpone surrender until the conclusion of the proceedings or the service of the whole or any part of the sentence imposed."

## ARTICLE VI

Paragraph (3) of Article 11 of the Extradition Treaty is deleted and replaced by the following:

"(3) A person arrested shall be set at liberty upon the expiration of sixty days from the date of arrest pursuant to such application if a request for extradition and the documents specified in Article 9 have not been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request and documents are subsequently received."

## ARTICLE VII

The Extradition Treaty is amended by adding the following after Article 17:

7

"ARTICLE 17 BIS

"If both contracting Parties have jurisdiction to prosecute the person for the offense for which extradition is sought, the executive authority of the requested State, after consulting with the executive authority of the requesting State, shall decide whether to extradite the person or to submit the case to its competent authorities for the purpose of prosecution. In making its decision, the requested State shall consider all relevant factors, including but not limited to:

"(i) the place where the act was committed or intended to be committed or the injury occurred or was intended to occur;

"(ii) the respective interests of the Contracting Parties;

"(iii) the nationality of the victim or the intended victim; and

"(iv) the availability and location of the evidence."

## ARTICLE VIII

Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date.

## ARTICLE IX

(1) This Protocol shall be subject to ratification in accordance with the applicable procedures of the Government of the United States and the Government of Canada and instruments of ratification shall be exchanged as soon as possible.

(2) The Protocol shall enter into force upon the exchange of instruments of ratification.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Ottawa, this 11th day of January 1988, in the English and French languages, the two texts being equally authentic.

For the Government of the United States of America.

GEORGE P. SHULTZ.

For the Government of Canada.

JOE CLARK.

## TREATIES AND OTHER INTERNATIONAL ACTS SERIES 8237

[Reprint of English text only]

# EXTRADITION

Treaty Between the
UNITED STATES OF AMERICA
and CANADA

Signed at Washington December 3, 1971

*and*

Agreement Amending the Treaty
Effected by Exchange of Notes
Signed at Washington June 28 and July 9, 1974



# CANADA

## Extradition

*Treaty signed at Washington December 3, 1971;*
*And agreement amending the treaty*
*Effected by exchange of notes*
*Signed at Washington June 28 and July 9, 1974;*
*Ratification of the treaty, as amended, advised by the Senate of*
*   the United States of America December 1, 1975;*
*Ratified by the President of the United States of America De-*
*   cember 12, 1975;*
*Ratified by Canada February 2, 1976;*
*Ratifications exchanged at Ottawa March 22, 1976;*
*Proclaimed by the President of the United States of America*
*   May 6, 1976;*
*Entered into force March 22, 1976.*

---

By the President of the United States of America

## A PROCLAMATION

Considering that:

The Treaty on Extradition between the United States of America and Canada was signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974, the original of which Treaty, as amended, is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, as amended;

The Treaty was ratified by the President of the United States of America on December 12, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Canada;

The respective instruments of ratification were exchanged at Ottawa on March 22, 1976;

It is provided in Article 18 of the Treaty that the Treaty shall enter into force upon the exchange of ratifications;

Now, therefore, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, as amended,

(1)                                    TIAS 8237

2.

to the end that it shall be observed and fulfilled with good faith on and after March 22, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

Done at the city of Washington this sixth day of May in the year of our Lord one thousand nine hundred seventy-six [SEAL] and of the Independence of the United States of America the two hundredth.

GERALD R. FORD

By the President:
  JOSEPH JOHN SISCO
    *Acting Secretary of State*

TIAS 8237

3

TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA
AND CANADA

The United States of America and Canada, desiring to make

more effective the cooperation of the two countries in the

repression of crime by making provision for the reciprocal

extradition of offenders, agree as follows:



4

ARTICLE 1

Each Contracting Party agrees to extradite to the other, in
the circumstances and subject to the conditions described in this
Treaty, persons found in its territory who have been charged with,
or convicted of, any of the offenses covered by Article 2 of this
Treaty committed within the territory of the other, or outside
thereof under the conditions specified in Article 3(3) of this
Treaty.

ARTICLE 2

(1)  Persons shall be delivered up according to the provisions
of this Treaty for any of the offenses listed in the Schedule
annexed to this Treaty, which is an integral part of this Treaty,
provided these offenses are punishable by the laws of both
Contracting Parties by a term of imprisonment exceeding one year.

(2)  Extradition shall also be granted for attempts to
commit, or conspiracy to commit or being a party to any of the
offenses listed in the annexed Schedule.

(3)  Extradition shall also be granted for any offense against
a federal law of the United States in which one of the offenses
listed in the annexed Schedule, or made extraditable by paragraph (2)
of this Article, is a substantial element, even if transporting,
transportation, the use of the mails or interstate facilities are
also elements of the specific offense.

ARTICLE 3

(1)  For the purpose of this Treaty the territory of a
Contracting Party shall include all territory under the
jurisdiction of that Contracting Party, including air space

TIAS 8237

5

and territorial waters and vessels and aircraft registered in
that Contracting Party or aircraft leased without crew to a lessee
who has his principal place of business, or, if the lessee has
no such place of business, his permanent residence in, that
Contracting Party if any such aircraft is in flight, or if any
such vessel is on the high seas when the offense is committed.
For the purposes of this Treaty an aircraft shall be considered
in flight from the moment when power is applied for the purpose
of the take-off until the moment when the landing run ends.

(2)  In a case when offense 23 of the annexed Schedule is
committed on board an aircraft at any time from the moment when
all its external doors are closed following embarkation until
the moment when any such door is opened for disembarkation, such
offense and any other offense covered by Article 2 committed
against passengers or crew of that aircraft in connection with
such offense shall be considered to have been committed within
the territory of a Contracting Party if the aircraft was
registered in that Contracting Party, if the aircraft landed in
the territory of that Contracting Party with the alleged offender
still on board, or if the aircraft was leased without crew to a
lessee who has his principal place of business, or, if the lessee
has no such place of business, his permanent residence in that
Contracting Party.

(3)  When the offense for which extradition has been requested
has been committed outside the territory of the requesting State,
the executive or other appropriate authority of the requested
State shall have the power to grant the extradition if the laws
of the requested State provide for jurisdiction over such an
offense committed in similar circumstances.

6

ARTICLE 4

(1)  Extradition shall not be granted in any of the following circumstances:

(i)  When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.

(ii) When the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State.

(iii) When the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of the above-mentioned character.  If any question arises as to whether a case comes within the provisions of this subparagraph, the authorities of the Government on which the requisition is made shall decide.

(2)  The provisions of subparagraph (iii) of paragraph (1) of this Article shall not be applicable to the following:

(i)  A kidnapping, murder or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt to commit such an offense with respect to any such person.

(ii) When offense 23 of the annexed Schedule, or an attempt to commit, or a conspiracy to commit, or being a party to the commission of that offense, has been committed  on board an aircraft engaged in commercial services carrying passengers.

TIAS 8237

7

## ARTICLE 5

If a request for extradition is made under this Treaty for a person who at the time of such request, or at the time of the commission of the offense for which extradition is sought, is under the age of eighteen years and is considered by the requested State to be one of its residents, the requested State, upon a determination that extradition would disrupt the social readjustment and rehabilitation of that person, may recommend to the requesting State that the request for extradition be withdrawn, specifying the reasons therefor.

## ARTICLE 6

When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

## ARTICLE 7

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

8

ARTICLE 8

The determination that extradition should or should not be
granted shall be made in accordance with the law of the requested
State and the person whose extradition is sought shall have the
right to use all remedies and recourses provided by such law.

ARTICLE 9

(1)  The request for extradition shall be made through the
diplomatic channel.

(2)  The request shall be accompanied by a description of the
person sought, a statement of the facts of the case, the text of
the laws of the requesting State describing the offense and
prescribing the punishment for the offense, and a statement of the
law relating to the limitation of the legal proceedings.

(3)  When the request relates to a person who has not yet
been convicted, it must also be accompanied by a warrant of
arrest issued by a judge or other judicial officer of the
requesting State and by such evidence as, according to the laws
of the requested State, would justify his arrest and committal
for trial if the offense had been committed there, including
evidence proving the person requested is the person to whom the
warrant of arrest refers.

(4)  When the request relates to a person already convicted,
it must be accompanied by the judgment of conviction and sentence
passed against him in the territory of the requesting State, by
a statement showing how much of the sentence has not been served,
and by evidence proving that the person requested is the person
to whom the sentence refers.

TIAS 8237

9

## ARTICLE 10

(1)  Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

(2)  The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada, or when, in the case of a request emanating from the United States, they are authenticated by an officer of the Department of State of the United States and are certified by the principal diplomatic or consular officer of Canada in the United States.

## ARTICLE 11

(1)  In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State.

10

(2)  On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

(3)  A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received.  This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

ARTICLE 12

(1)  A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted nor be extradited by that State to a third State unless:

(i)  He has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(ii)  He has not left the territory of the requesting State within thirty days after being free to do so; or

(iii) The requested State has consented to his detention, trial, punishment for an offense other than that for which extradition was granted or to his extradition to a third State, provided such other offense is covered by Article 2.

(2)  The foregoing shall not apply to offenses committed after the extradition.

11

## ARTICLE 13

(1)  A requested State upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought.

(2)  Among the matters which the requested State may take into consideration are the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

## ARTICLE 14

(1)  The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2)  If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as may be prescribed by the laws of that State, he may be set at liberty and the requested State may subsequently refuse to extradite that person for the same offense.

## ARTICLE 15

(1)  To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence shall, if found, be surrendered to the requesting State if extradition is granted.

12

(2)  Subject to the qualifications of paragraph (1) of this Article, the above-mentioned articles shall be returned to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.

ARTICLE 16

(1)  The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel, provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

(2)  The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

ARTICLE 17

(1)  Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State.  The appropriate legal officers of the State in which the extradition proceedings take place shall, by all legal means within their power, assist the requesting State before the respective judges and magistrates.

13

(2)  No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

ARTICLE 18

(1)  This Treaty shall be ratified and the instruments of ratification shall be exchanged at Ottawa as soon as possible.

(2)  This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.

(3)  This Treaty shall enter into force upon the exchange of ratifications.[1]  It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

_____

[1] Mar. 22, 1976.

14

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and French languages, each language version being equally authentic, at Washington this third day of December, one thousand nine hundred seventy one.

FOR THE UNITED STATES OF AMERICA:

*William Rogers* [1]

FOR CANADA:

*Mitchell Sharp* [1]

---

[1] William P. Rogers
[1] Mitchell Sharp

TIAS 8237

15

SCHEDULE

1.   Murder; assault with intent to commit murder.

2.   Manslaughter.

3.   Wounding; maiming; or assault occasioning bodily harm.

4.   Unlawful throwing or application of any corrosive substances
     at or upon the person of another.

5.   Rape; indecent assault.

6.   Unlawful sexual acts with or upon children under the age
     specified by the laws of both the requesting and requested
     States.

7.   Willful nonsupport or willful abandonment of a minor when
     such minor is or is likely to be injured or his life is or
     is likely to be endangered.

8.   Kidnapping; child stealing; abduction; false imprisonment.

9.   Robbery; assault with intent to steal.

10.  Burglary; housebreaking.

11.  Larceny, theft or embezzlement.

12.  Obtaining property, money or valuable securities by false
     pretenses or by threat of force or by defrauding the public
     or any person by deceit or falsehood or other fraudulent
     means, whether such deceit or falsehood or any fraudulent
     means would or would not amount to a false pretense.

13.  Bribery, including soliciting, offering and accepting.

14.  Extortion.

16

15. Receiving any money, valuable securities or other property
knowing the same to have been unlawfully obtained.

16. Fraud by a banker, agent, or by a director or officer of
any company.

17. Offenses against the laws relating to counterfeiting or
forgery.

18. Perjury in any proceeding whatsoever.

19. Making a false affidavit or statutory declaration for any
extrajudicial purpose.

20. Arson.

21. Any act done with intent to endanger the safety of any
person travelling upon a railway, or in any aircraft or
vessel or other means of transportation.

22. Piracy, by statute or by law of nations; mutiny or revolt
on board a vessel against the authority of the captain or
commander of such vessel.

23. Any unlawful seizure or exercise of control of an aircraft,
by force or violence or threat of force or violence, or by
any other form of intimidation, on board such aircraft.

24. Willful injury to property.

25. Offenses against the bankruptcy laws.

26. Offenses against the laws relating to the traffic in,
production, manufacture, or importation of narcotic drugs,
Cannabis sativa L., hallucinogenic drugs, amphetamines,
barbiturates, cocaine and its derivatives.

17

27. Use of the mails or other means of communication in connection with schemes devised or intended to deceive or defraud the public or for the purpose of obtaining money or property by false pretenses.

28. Offenses against federal laws relating to the sale or purchase of securities.

29. Making or having in possession any explosive substance with intent to endanger life, or to cause severe damage to property.

30. Obstructing the course of justice in a judicial proceeding, existing or proposed, by:

    a)   dissuading or attempting to dissuade a person by threats, bribes, or other corrupt means from giving evidence;

    b)   influencing or attempting to influence by threat, bribes, or other corrupt means a person in his conduct as a juror; or

    c)   accepting a bribe or other corrupt consideration to abstain from giving evidence or to do or to refrain from doing anything as a juror.

35

[AMENDING AGREEMENT]

*The Canadian Ambassador to the Secretary of State*



Canadian Embassy      Ambassade du Canada

Washington, D.C.

June 28, 1974

No. 126

Excellency,

I have the honour to refer to the Treaty on Extradition between the Government of Canada and the Government of the United States signed at Washington on December 3, 1971 and to subsequent discussions between representatives of our two governments concerning the amendment of the said Treaty.

Further to those discussions I now have the honour to propose that the said Treaty be amended as follows:

(1) That Article 4(2)(i) of the Treaty shall
be amended to read: "A kidnapping, murder,
or other assault against the life or physical
integrity of a person to whom a Contracting
Party has the duty according to international
law to give special protection, or any attempt
or conspiracy to commit, or being a party to

The Honourable
  Henry A. Kissinger,
    Secretary of State,
    Washington, D.C.
      20520

TIAE 8237

36

the commission of, such an offence with
respect to any such person."

(7) That clause 26 of the Schedule annexed to
the Treaty shall be amended to read:
"Offences against the laws relating to
the traffic in, production, manufacture or
importation of drugs listed in Schedule I
to the Single Convention on Narcotic Drugs
of March 30, 1961 [1] and of drugs listed in
Schedules I, II and III to the Convention
on Psychotropic Substances of February 21,
1971."

If this proposal meets with the approval of your
government, I have the further honour to propose that
this Note, which is authentic in English and in French,
and your reply shall constitute an amendment to the Treaty
on Extradition between Canada and the United States referred
to above, which shall come into force on the date of the
entry into force of the said Treaty and which shall be con-
sidered an integral part of the said Treaty.

Accept, Excellency, the assurances of my highest
consideration.

*M. Cadieux,*

M. Cadieux,
Ambassador.

---

[1] TIAS 6298; 18 UST 1559.

TIAS 8237

39

*The Secretary of State to the Canadian Ambassador*

DEPARTMENT OF STATE
WASHINGTON

July 9, 1974

Excellency:

I have the honor to refer to your note of June 28, 1974, in the English and French languages, relating to amendment of the Treaty on Extradition between the United States of America and Canada, signed at Washington December 3, 1971.

On behalf of the United States of America I confirm the understanding set forth therein and consider that your note and this reply constitute an agreement between the United States and Canada on this matter.

Accept, Excellency, the renewed assurances of my highest consideration.

For the Secretary of State:

Acting Secretary

*Joseph John Sisco*

His Excellency

Marcel Cadieux,

Ambassador of Canada.

TIAS 8237

U.S. GOVERNMENT PRINTING OFFICE: 1974   O—73-706

# EXHIBIT B



Embassy of the United States of America

Certificate to be Attached to Documentary Evidence Accompanying
Requisitions in the United States for Extradition

## AMERICAN FOREIGN SERVICE

Ottawa, Canada, May 29, 2015

I, Bruce A. Heyman, Ambassador of the United States of America at
Ottawa, Canada, hereby certify that the annexed papers, being
authenticated supporting documents proposed to be used upon an
application for the extradition from the United States of Kenneth Wayne
FROUD, who is wanted in the Province of Ontario to stand trial on three
charges of failing to comply with a Long Term Supervision Order (LTSO),
contrary to the Criminal Code and to serve 3409 days remaining to be
served on the LTSO that accompanied a 30 month sentence imposed on one
count of Break and Enter and Commit Sexual Assault contrary to s.
348(1)(b) of the Criminal Code; one count of Utter a Threat to cause
Bodily Harm contrary to s. 264.1(2) of the Criminal Code; and one count
of Sexual Assault Using a Weapon, contrary to s.272(2) of the Criminal
Code,are properly and legally authenticated so as to entitle them to be
received in evidence for similar purposes by the tribunals of Canada, as
required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of
office to be affixed this 29th day of May, 2015.

Bruce A. Heyman
Ambassador of the
United States of America

Form 36- Foreign Service

Justice   Ministère de la Justice
Canada

anada
8

## CERTIFICATE OF AUTHENTICATION

*IN THE MATTER OF the extradition of KENNETH WAYNE
FROUDE from the United States of America to Ontario,
Canada*

I, CATHY CHALIFOUR, Counsel, International Assistance Group,
Department of Justice of Canada, do hereby certify:

THAT attached to this Certificate is authenticated documentation
presented by Canada in support of the extradition of Kenneth Wayne
Froude who is wanted in the Province of Ontario to stand trial on three
charges of failing to comply with a Long Term Supervision Order,
contrary to the *Criminal Code* and to serve 3409 days remaining to be
served on the said Long Term Supervision Order that accompanied a 30
month sentence imposed on one count of Break and Enter and Commit
Sexual Assault contrary to s. 348(1)(b) of the *Criminal Code*; one count
of Utter a Threat to cause Bodily Harm, contrary to s. 264.1(2) of the
*Criminal Code*; and one count of Sexual Assault Using a Weapon,
contrary to s. 272(2) of the *Criminal Code*.

THAT the documentation attached to this certificate is composed of:

- the original Affidavit of Law prepared by KAREN SHAI, Counsel in
  the Crown Law Office - Criminal, Ministry of the Attorney General
  for the Province of Ontario prepared on May 15, 2015, to which is
  attached:

  - as exhibit "E", a certified true copy of the Warrant for
    Arrest.

- the original Affidavit of Facts prepared by LISA MANSON, National
  Manager, Sentence Management for the Correctional Service of
  Canada, prepared on May 19, 2015, to which is attached:

  - as exhibit "E", a certified true copy of the Warrant of
    Apprehension, Suspension and Recommitment to Custody of
    Long Term Supervision.

# Canada

- 2 -

THAT Gregory J. Tweney whose original signature appears at the end of the Affidavit of Karen Shai, is a Commissioner of Oaths for the Province of Ontario, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

THAT Sean Martin Peré whose original signature appears at the end of the Affidavit of Lisa Manson, is a Commissioner of Oaths for the Province of Ontario, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

The Seal of the Minister of Justice of Canada is hereby affixed this 24th day of May, 2015.

Cathy Chalifour



|  |  |
|---|---|
| CANADA<br>PROVINCE OF ONTARIO | IN THE MATTER OF a request for the extradition of Kenneth Wayne FROUDE from the United States to Canada to face prosecution for three counts of an offence contrary to the *Criminal Code of Canada* and to serve the remainder of a Long Term Supervision Order |

## AFFIDAVIT OF LAW OF KAREN SHAI

I, Karen Shai, of the City of Toronto, Province of Ontario, Canada, MAKE OATH AND SAY AS FOLLOWS:

### A.   QUALIFICATIONS

1.    I am a Barrister and Solicitor, qualified to practice law in the Province of Ontario, Canada, since March 1998.  Since that time, I have been practicing law in the position of Counsel in the Crown Law Office – Criminal, Ministry of the Attorney General for the Province of Ontario.

2.    The Crown Law Office – Criminal is a branch of the Criminal Law Division of the Ministry of the Attorney General for the province of Ontario.  At present, it is composed of approximately 90 lawyers, each of whom specializes in the practice of criminal law.  The Crown Law Office – Criminal maintains carriage of all appeals in relation to serious criminal matters arising in Ontario, before the Court of Appeal for Ontario and the Supreme Court of Canada.  Counsel in the Crown Law Office – Criminal also conduct prosecutions of complex and sensitive criminal matters, such as complex frauds, offences involving public corruption, organized crime, and serious offences against the administration of justice.  In addition, the Crown Law Office – Criminal handles a wide variety of other responsibilities relating to the administration of criminal justice in Ontario, including the preparation of materials in support of applications for the extradition/temporary surrender from foreign jurisdictions, to Canada, of persons who have been charged with the commission of criminal offences in Ontario.

3.    As a result of my training and experience, I am knowledgeable in the criminal and sentencing laws of Canada.

**B.**   **CANADA'S REQUEST FOR THE EXTRADITION OF KENNETH FROUDE**

4.      The extradition of Mr. FROUDE is sought in order to enforce the balance of 3409 days remaining to serve on his Long Term Supervision Order (LTSO).  His extradition is also sought for prosecution on three charges of failing to comply with a LTSO.  His extradition is not being sought for a fourth charge of failing to comply with the *Sex Offender Information Registration Act* (SOIRA).

**C.**   **CANADIAN LAW**

5.      In Canada, the federal government has legislative authority for criminal law. Canada's *Criminal Code,* R.S.C. 1985, c. C-46, is a statute duly enacted by the Parliament of Canada and applies across the country.

6.      In each of Canada's provinces, the provincial Attorney General has jurisdiction to enforce criminal law and conduct prosecutions relating to offences set out in the *Criminal Code.*

7.      To be convicted of a criminal offence in Canada, the prosecution must prove all elements of the offence beyond a reasonable doubt.

8.      Before charges are laid in the province of Ontario, a prosecutor reviews all the evidence obtained in the police investigation.  It is the policy of the Attorney General for Ontario that charges are only approved if the prosecutor is satisfied that there is a reasonable prospect of conviction on the available evidence and, if so, it is also in the public interest to proceed against the accused person.

9.      The *Criminal Code of Canada,* Revised Statutes of Canada, 1985, chapter C-46, as amended, is a statute duly enacted by the Parliament of Canada, containing the law relating to criminal offences for the whole of Canada, including the Province of Ontario. The *Criminal Code* was in force at the time of the commission of the alleged offences in this case, and it continues to be in force at the present time.  The *Criminal Code* sets out definitions of offences, the maximum sentences possible for those offences, and sometimes also a minimum sentence that must be imposed for some offences.  The *Criminal Code* also sets out the provisions dealing with the designation of an offender as a Long-Term Offender and the related LTSO provisions.

10.     Pursuant to the *Criminal Code*, a form called an 'Information' is the document by which charges are initiated and brought before the court.  The purpose of the Information is to state the offence(s) an accused person is facing and to give notice of the particular offence(s) they are alleged to have committed.

11.     Under the *Criminal Code,* there are three types of offences: summary conviction, hybrid and indictable offences.  Indictable offences are the most serious offences and the sentencing options vary, but are more significant.  Summary conviction offences are less serious and generally have a maximum punishment of six months incarceration and/or a five thousand dollar fine, or both.   Hybrid offences may be prosecuted by either indictment or summary conviction procedure at the election of the prosecution.

12.     Once an offender is convicted and sentenced to a term of imprisonment of two years or more, the Correctional Services of Canada ("CSC") becomes responsible for the safe and humane custody and supervision of that offender under the authority of the *Corrections and Conditional Release Act*, S.C. 1992, c.20. CSC not only oversees the administration of an offender's sentence while he is imprisoned, but also oversees the supervision of offenders who have been designated as Long-Term Offenders and are released into the community under a LTSO.

13.     A judge will designate an offender to be a "Long-Term Offender" in situations where he or she is satisfied that the conditions specified under ss. 753.1(1) of the *Criminal Code* are met. The general conditions required for a court to order the long term supervision of an offender are the same today as they were in 2004, when Mr. FROUDE committed the predicate offences for which he was ultimately declared a Long-Term Offender in 2008. Long-Term Offender designations are available when:

    a.  It would be appropriate to impose a sentence of imprisonment of two years or more for the offence for which the offender has been convicted;

    b.  There is a substantial risk that the offender will reoffend; and

    c.  There is a reasonable possibility of eventual control of the risk in the community.

14.     Subsection 753.1(2) guides the court in determining whether there is a substantial risk that the offender will reoffend. It has changed slightly since 2004.  A copy of the provision as it read in 2004 can be found at **Exhibit "A"** to this Affidavit.

15.     In 2004, s. 753.1(3) stipulated that, where a court finds an offender to be a Long-Term Offender, the court shall:

10.     Pursuant to the *Criminal Code*, a form called an 'Information' is the document by which charges are initiated and brought before the court. The purpose of the Information is to state the offence(s) an accused person is facing and to give notice of the particular offence(s) they are alleged to have committed.

11.     Under the *Criminal Code*, there are three types of offences: summary conviction, hybrid and indictable offences. Indictable offences are the most serious offences and the sentencing options vary, but are more significant. Summary conviction offences are less serious and generally have a maximum punishment of six months incarceration and/or a five thousand dollar fine, or both. Hybrid offences may be prosecuted by either indictment or summary conviction procedure at the election of the prosecution.

12.     Once an offender is convicted and sentenced to a term of imprisonment of two years or more, the Correctional Services of Canada ("CSC") becomes responsible for the safe and humane custody and supervision of that offender under the authority of the *Corrections and Conditional Release Act*, S.C. 1992, c.20. CSC not only oversees the administration of an offender's sentence while he is imprisoned, but also oversees the supervision of offenders who have been designated as Long-Term Offenders and are released into the community under a LTSO.

13.     A judge will designate an offender to be a "Long-Term Offender" in situations where he or she is satisfied that the conditions specified under ss. 753.1(1) of the *Criminal Code* are met. The general conditions required for a court to order the long term supervision of an offender are the same today as they were in 2004, when Mr. FROUDE committed the predicate offences for which he was ultimately declared a Long-Term Offender in 2008. Long-Term Offender designations are available when:

     a.  It would be appropriate to impose a sentence of imprisonment of two years or more for the offence for which the offender has been convicted;

     b.  There is a substantial risk that the offender will reoffend; and

     c.  There is a reasonable possibility of eventual control of the risk in the community.

14.     Subsection 753.1(2) guides the court in determining whether there is a substantial risk that the offender will reoffend. It has changed slightly since 2004. A copy of the provision as it read in 2004 can be found at **Exhibit "A"** to this Affidavit.

15.     In 2004, s. 753.1(3) stipulated that, where a court finds an offender to be a Long-Term Offender, the court shall:

a.   Impose a sentence for the offence for which the offender has been convicted, which sentence must be a minimum punishment of imprisonment for a term of two years; and

b.   Order the offender to be supervised in the community, for a period not exceeding ten years, in accordance with section 753.2 and the *Corrections and Conditional Release Act.*

16.   A copy of this provision is also included in **Exhibit "A"** to this Affidavit.

17.   When a court designates an offender to be a Long-Term Offender, there are standard conditions that will apply to that offender upon release from custody. These standard conditions are set out in ss. 161(1) of the *Corrections and Conditional Release Act* Regulations, SOR 92-620. A copy of this Regulation is provided as **Exhibit "B"** to this Affidavit. In addition, the Parole Board of Canada will impose a variety of special conditions that will govern an offender's release.

18.   The provisions relating to the offence for which prosecution is sought as they were worded at the time of the alleged charges (May 2013) are unchanged to the present day, and are what would be applicable to a trial of these charges in Ontario today. The criminal offence of Failing to Comply with a LTSO contrary to s.753.3(1) of the *Criminal Code* alleged against Mr. FROUDE in the Information is attached hereto and marked as **Exhibit "C"** to this Affidavit.

**D.    THE CRIMINAL CHARGES AND THE ARREST WARRANT IN THIS CASE**

19.   Mr. FROUDE's extradition is being sought for three of the four criminal charges with which he is currently charged – i.e. three charges of Failing to Comply with a LTSO contrary to s.753.3(1) of the *Criminal Code*.  These charges are outstanding in Canada.  I am informed, and I believe, that Mr. FROUDE was never arrested in Canada in respect of these charges and has never attended court in Canada in relation to these charges.

20.   As stated above, under Canadian law, a person is formally charged with a crime when an Information is sworn before a justice (i.e. a Justice of the Ontario Court of Justice, or a Justice of the Peace).  The charge is formally "laid" when an informant, usually a police officer, swears under oath that s/he has reasonable grounds to believe that an offence was committed by the accused person, as detailed in the Information. Following the laying of an Information, a warrant for the arrest of the accused person may be issued where the Justice considers that a case for doing so is made out.

21.     In the present case, a total of three charges were initially laid against Mr. FROUDE in connection with this matter.   However, on April 29, 2015, a new Information was sworn by Patti Loyst, a police officer with the Kingston Police Force, joining the charges on a single Information, correcting an error in relation to the date of Mr. FROUDE's LTSO, adding two charges, and removing a charge which was incorrectly laid.  As such, the new Information charges Mr. FROUDE with four charges - three charges of failing to comply with a LTSO contrary to s.753.3(1) of the *Criminal Code* and one charge of failing to comply with the SOIRA contrary to s.490.031(1) of the *Criminal Code*.

22.     The three charges for failing to comply with a LTSO relate to breaches of three of the terms of Mr. FROUDE's LTSO including that he reside at a community correctional centre or facility approved by the CSC, that he remain in Canada, and that he 'obey the law and keep the peace'.  The new Information was issued by Justice of the Peace C.E. Hickling on April 29, 2015.  A court-certified copy of the current Information is attached as **Exhibit "D"** to this Affidavit.  The copy was certified by a clerk of the Ontario Court of Justice.

23.     Again, Mr. FROUDE's extradition is only being sought on the three charges of failing to comply with a LTSO.  His extradition is not sought on the fourth charge of failing to comply with the SOIRA.

24.     On April 29, 2015, Justice of the Peace C.E. Hickling issued a Warrant for the arrest of Kenneth FROUDE, on the basis of reasonable grounds to believe that it was necessary in the public interest to issue that warrant.  On April 30, 2015, the arrest warrant was endorsed as Canada-wide by Justice Tranmer of the Superior Court of Justice.  A court-certified copy of the Warrant for Arrest is attached as **Exhibit "E"** to this Affidavit.

25.     The Warrant for Arrest issued on April 29, 2015, by Justice of the Peace Hickling is a judicial document authorizing the arrest of Mr. FROUDE, and it is presently outstanding, and in force, in respect of the charges contained therein.  Pursuant to the *Criminal Code of Canada*, Justice of the Peace Hickling is a judicial officer and competent authority with jurisdiction to issue warrants of arrest for persons accused of criminal offences under the *Criminal Code of Canada*.

### E.    LTSO REMAINING TO BE SERVED

26.    On March 9, 2006, in the Superior Court of Justice in London, Ontario, Mr. FROUDE was convicted by a Superior Court Justice, sitting with a jury, on one count of break and enter and commit a sexual assault, one count of sexual assault with a weapon and one count of uttering threats to cause bodily harm in relation to offences that were committed in 2004.  A copy of the text of sections 348(1)(b), 264.1, 272(1) and (2) of the *Criminal Code,* as they appeared in 2004, is provided as **Exhibit "F"** to this Affidavit.

27.    On May 5, 2008, Justice Rady of the Superior Court of Justice declared Mr. FROUDE a Long-Term Offender.  A copy of Justice Rady's decision is attached as **Exhibit "G"** to this Affidavit.  On May 16, 2008, Justice Rady sentenced Mr. FROUDE to 10 years imprisonment (comprised of 30 months in addition to 1344 days spent in pre-trial custody, credited at a ratio of 2:1) for the three offences.  She also imposed the maximum duration of 10 years for the LTSO.  A copy of Justice Rady's decision is attached as **Exhibit "H"** to this Affidavit.

28.    The special conditions imposed on Mr. FROUDE as part of his LTSO are set out at paragraph 5 of the affidavit of Lisa Manson.

29.    Mr. FROUDE appealed his 10 year jail sentence to the Ontario Court of Appeal. He did not appeal the Long-Term Offender designation, nor did he appeal the imposition or duration of the LTSO. On April 21, 2009, Mr. FROUDE's appeal against sentence was dismissed by the Court.  A copy of the Ontario Court of Appeal's decision, and the Court's Order dismissing the appeal, is attached as **Exhibit "I"** to this Affidavit.

30.    Mr. FROUDE was released from prison for the three criminal offences set out above on November 12, 2010, and was subject to the 10 year LTSO.  On March 25, 2011, he pled guilty to three charges in connection with breaching his LTSO by failing to report to a parole officer and by placing a call to a female correctional officer at the jail from which he had been released.  He was charged under ss. 753.3(1) and 264(2)(d) of the *Criminal Code.*  He was sentenced to 19 months of imprisonment for these offences, and his 10 year LTSO was suspended while he served that sentence.  A copy of the court's decision is attached as **Exhibit "J"** to this Affidavit. Attached as **Exhibit "K"** to this Affidavit is a copy of the two *Criminal Code* provisions under which Mr. FROUDE was charged. Neither of these provisions has been amended since 2011.

31.     Under Canadian law, Statutory Release is a legally mandated release period for offenders incarcerated in a penitentiary. These offenders are entitled to Statutory Release after they have served two thirds of their sentence, at which point they are supervised in the community.

32.     On April 12th, 2012, Mr. FROUDE was released on Statutory Release in relation to the aforementioned 19 month sentence.  One of the conditions of his release was that he reside at the Hochelaga Community Correctional Centre in Montreal, Canada. Instead of remaining in Montreal, Mr. FROUDE entered the United States.  CSC determined that Mr. FROUDE's whereabouts were unknown and a Warrant of Apprehension, Suspension and Recommitment to Custody was issued pursuant to subsection 135(1) of the *Corrections and Conditional Release Act*.  He was returned to Canada by U.S. Homeland Security on July 19, 2012.

33.     Upon eventual completion of his sentence, Mr. FROUDE was again subject to his LTSO as of January 28th, 2013. On May 18th, 2013, Mr. FROUDE's whereabouts again became unknown and a Warrant of Apprehension, Suspension and Recommitment to custody of Long Term Supervision was again issued pursuant to subsection 135.1(1) of the *Corrections and Conditional Release Act*. This warrant, which provides for the arrest of Mr. FROUDE, remains outstanding.

34.     Mr. FROUDE has 3409 days remaining to serve on his LTSO. CSC seeks to enforce the remainder of this supervision order.

## F.   PROSECUTION FOR THE OFFENCE OF BREACHING THE LTSO

35.     As set out at paragraph 21 above, on April 29, 2015, Mr. FROUDE was charged by the Attorney General of Ontario with 3 counts of failing to comply with his Long-Term Supervision Order (LTSO) under s.753.3(1) of the *Criminal Code*.  This is an indictable offence which carries a maximum sentence of 10 years imprisonment. The three charges for failing to comply with a LTSO relate to breaches of three of the terms of Mr. FROUDE's LTSO including that he reside at a community correctional centre or facility approved by the CSC, that he remain in Canada, and that he 'obey the law and keep the peace'. The relevant provision from the 2013 *Criminal Code* is attached at **Exhibit "C"** to this Affidavit.

## G.   ELECTION AND LIMITATION PERIOD

36.   If extradited to Canada, Mr. FROUDE will be tried on the three criminal charges together.   The offence of breaching a LTSO contrary to s.753.3(1) of the *Criminal Code* is a purely indictable offence.   In Canada, there is no statutory limitation period of general application in respect of indictable offences.   In the absence of a specific statutory provision to the contrary, the initiation of the prosecution of an indictable offence is not barred by the passage of any period of time, solely on account of that passage of time. There is no statutory enactment which prescribes the time within which a prosecution must be commenced for the charges faced by Mr. FROUDE.   Furthermore, there is no statutory limitation for the enforcement of a LTSO.

## H.   OPINION

37.   I have read the Affidavit of Lisa Manson and its attached exhibits, which accompany Canada's request for the extradition of Mr. FROUDE from the United States of America.   I am of the opinion that the offence for which the extradition of Mr. FROUDE is requested is properly triable in the Province of Ontario, and that the criminal courts in the Province of Ontario have jurisdiction to try Mr. FROUDE on these charges.

38.   I am also of the opinion that the offence for which Mr. FROUDE's extradition is sought is not of a political nature in the alleged circumstances of this case.   The charges have not been laid against Mr. FROUDE for the purpose of prosecuting or punishing him on account of his race, religion, nationality, or political belief.

39.   Likewise, I verily believe that Mr. FROUDE has 3409 days remaining to serve on his LTSO. CSC seeks to enforce the remainder of this supervision order.

40.   This affidavit is made in good faith, in support of a request by Canada for the extradition of Mr. FROUDE to be prosecuted on the aforementioned charges and for the enforcement of a LTSO, and for no improper purpose.

SWORN BEFORE ME, in the City    )
of Toronto, in the Province of        )
Ontario, this  15   day of            )
_____ May _____, 2015            )

_____
A Commissioner of Oaths, etc.
GREGORY J. TWENEY

_____
Karen Shai

**Exhibit "A" to the Affidavit of Karen Shai –
s.753.1 Provisions of the 2004 *Criminal Code***

THIS IS EXHIBIT ............" *A* "............ TO THE

AFFIDAVIT OF ..... Karen   Shai .....

SWORN BEFORE ME

THIS ...... *15th* ...... DAY OF ..... May ........ 20. *15*

A Commissioner, &c.



Current to May 9, 2015

R.S.C. 1985, c. C-46, s. 753.1

[eff July 23, 2002 to July 1, 2008](Past Version)

# Criminal Code

# R.S.C. 1985, c. C-46

### PART XXIV DANGEROUS OFFENDERS AND LONG-TERM OFFENDERS

#### Dangerous Offenders and Long-Term Offenders

## SECTION 753.1

*Application for finding that an offender is a long-term offender*

753.1 (1) The court may, on application made under this Part following the filing of an assessment report under subsection 752.1(2), find an offender to be a long-term offender if it is satisfied that

    (a) it would be appropriate to impose a sentence of imprisonment of two years or more for the offence for which the offender has been convicted;

    (b) there is a substantial risk that the offender will reoffend; and

    (c) there is a reasonable possibility of eventual control of the risk in the community.

*Substantial risk*

(2) The court shall be satisfied that there is a substantial risk that the offender will reoffend if

    (a) the offender has been convicted of an offence under section 151 (sexual interference), 152 (invitation to sexual touching) or 153 (sexual exploitation), subsection 163.1(2) (making child pornography), subsection 163.1(3) (distribution, etc., of child pornography), subsection 163.1(4) (possession of child pornography), subsection 163.1(4.1) (accessing child pornography), section 172.1 (luring a child), subsection 173(2) (exposure) or section 271 (sexual assault), 272 (sexual assault with a



weapon) or 273 (aggravated sexual assault), or has engaged in serious conduct of a sexual nature in the commission of another offence of which the offender has been convicted; and

(b) the offender

(i) has shown a pattern of repetitive behaviour, of which the offence for which he or she has been convicted forms a part, that shows a likelihood of the offender's causing death or injury to other persons or inflicting severe psychological damage on other persons, or

(ii) by conduct in any sexual matter including that involved in the commission of the offence for which the offender has been convicted, has shown a likelihood of causing injury, pain or other evil to other persons in the future through similar offences.

*If offender found to be long-term offender*

(3) Subject to subsections (3.1), (4) and (5), if the court finds an offender to be a long-term offender, it shall

(a) impose a sentence for the offence for which the offender has been convicted, which sentence must be a minimum punishment of imprisonment for a term of two years; and

(b) order the offender to be supervised in the community, for a period not exceeding ten years, in accordance with section 753.2 and the Corrections and Conditional Release Act.

*Exception - if application made after sentencing*

(3.1) The court may not impose a sentence under paragraph (3)(a) and the sentence that was imposed for the offence for which the offender was convicted stands despite the offender's being found to be a long-term offender, if the application was one that

(a) was made after the offender begins to serve the sentence in a case to which paragraphs 753(2)(a) and (b) apply; and

(b) was treated as an application under this section further to the court deciding to do so under paragraph 753(5)(a).

*Exception - life sentence*

(4) The court shall not make an order under paragraph (3)(b) if the offender has been sentenced to life imprisonment.

*Exception to length of supervision where new declaration*

(5) If the offender commits another offence while required to be supervised by an order made under paragraph (3)(b), and is thereby found to be a long-term offender, the periods of supervision to which the offender is subject at any particular time must not total more than ten years.

*If offender not found to be long-term offender*

(6) If the court does not find an offender to be a long-term offender, the court shall impose sentence for the offence for which the offender has been convicted.

```
                      ** Editor's Table **

      Provision      Changed by      In force     Authority

      753.1          1997 c17 s4     1997 Aug 1   SI/97-84
      753.1(2)(a)    2002 c13 s76    2002 Jul 23  SI/2002-106
                              *****
```

*S.C. 1997, c. 17, s. 4; S.C. 2002, c. 13, s. 76.*

Exhibit "B" to the Affidavit of Karen Shai —
s.161(1) of the *Corrections and Conditional Release Act*, Regulation SOR 92-620

THIS IS EXHIBIT ............"B".......... TO THE

AFFIDAVIT OF ...... Karen  Shai....

SWORN BEFORE ME

THIS ....15ᵗʰ...... DAY OF ....May.. 20.15

.......................................

A Commissioner, etc.



Page 2

Current to April 22, 2015

SOR/92-620, s. 161

**Corrections and Conditional Release Act**

**Corrections and Conditional Release Regulations**

Registration 29 October, 1992

**SOR/92-620**

P.C. 1992-2223 29 October, 1992

**PART II CONDITIONAL RELEASE**

**Conditions of Release**

**SECTION 161.**

161. (1) For the purposes of subsection 133(2) of the Act, every offender who is released on parole or statutory release is subject to the following conditions, namely, that the offender

(a) on release, travel directly to the offender's place of residence, as set out in the release certificate respecting the offender, and report to the offender's parole supervisor immediately and thereafter as instructed by the parole supervisor;

(b) remain at all times in Canada within the territorial boundaries fixed by the parole supervisor;

(c) obey the law and keep the peace;

(d) inform the parole supervisor immediately on arrest or on being questioned by the police;

(e) at all times carry the release certificate and the identity card provided by the releasing authority and produce them on request for identification to any peace officer or parole supervisor;



(f) report to the police if and as instructed by the parole supervisor;

(g) advise the parole supervisor of the offender's address of residence on release and thereafter report immediately

    (i) any change in the offender's address of residence,

    (ii) any change in the offender's normal occupation, including employment, vocational or educational training and volunteer work,

    (iii) any change in the domestic or financial situation of the offender and, on request of the parole supervisor, any change that the offender has knowledge of in the family situation of the offender, and

    (iv) any change that may reasonably be expected to affect the offender's ability to comply with the conditions of parole or statutory release;

(h) not own, possess or have the control of any weapon, as defined in section 2 of the Criminal Code, except as authorized by the parole supervisor; and

(i) in respect of an offender released on day parole, on completion of the day parole, return to the penitentiary from which the offender was released on the date and at the time provided for in the release certificate.

(2) For the purposes of subsection 133(2) of the Act, every offender who is released on unescorted temporary absence is subject to the following conditions, namely, that the offender

    (a) on release, travel directly to the destination set out in the absence permit respecting the offender, report to a parole supervisor as directed by the releasing authority and follow the release plan approved by the releasing authority;

    (b) remain in Canada within the territorial boundaries fixed by the parole supervisor for the duration of the absence;

(c) obey the law and keep the peace;

(d) inform the parole supervisor immediately on arrest or on being questioned by the police;

(e) at all times carry the absence permit and the identity card provided by the releasing authority and produce them on request for identification to any peace officer or parole supervisor;

(f) report to the police if and as instructed by the releasing authority;

(g) return to the penitentiary from which the offender was released on the date and at the time provided for in the absence permit;

(h) not own, possess or have the control of any weapon, as defined in section 2 of the Criminal Code, except as authorized by the parole supervisor.

Exhibit "C" to the Affidavit of Karen Shai –
ss. 753.3(1) of the 2013 *Criminal Code*

THIS IS EXHIBIT ............."C"............ TO THE

AFFIDAVIT OF ...... Karen Shai

SWORN BEFORE ME

THIS ......15th...... DAY OF ...... May ....20..15

A Commissioner, etc.



Current to May 9, 2015

R.S.C. 1985, c. C-46, s. 753.3

[eff since July 2, 2008](Current Version)

## Criminal Code

### R.S.C. 1985, c. C-46

### PART XXIV
### DANGEROUS OFFENDERS AND LONG-TERM OFFENDERS

#### Dangerous Offenders and Long-Term Offenders

#### SECTION 753.3

*Breach of long-term supervision*

753.3 (1) An offender who, without reasonable excuse, fails or refuses to comply with long-term supervision is guilty of an indictable offence and liable to imprisonment for a term not exceeding 10 years.

*Where accused may be tried and punished*

(2) An accused who is charged with an offence under subsection (1) may be tried and punished by any court having jurisdiction to try that offence in the place where the offence is alleged to have been committed or in the place where the accused is found, is arrested or is in custody, but if the place where the accused is found, is arrested or is in custody is outside the province in which the offence is alleged to have been committed, no proceedings in respect of that offence shall be instituted in that place without the consent of the Attorney General of that province.

```
                    ** Editor's Table **

    Provision       Changed by      In force     Authority

    753.3           1997 c17 s4     1997 Aug 1   SI/97-84
    753.3           2008 c6 s46     2008 Jul 2   SI/2008-34
                        *****
```

*S.C. 1997, c. 17, s. 4; S.C. 2008, c. 6, s. 46.*

Exhibit "D" to the Affidavit of Karen Shai –
Current Information
(issued on April 29/15)

THIS IS EXHIBIT ............"D".......... TO THE

AFFIDAVIT OF ... Karen Shai ...

SWORN BEFORE ME

THIS ...15th... DAY OF ...May...20l5

A Commissioner, etc.

KINGSTON POLICE FORCE
CC#: 13-14399 Inv.Off.:175

REPLACE INFO - 2 / WARRANT      Police Case ID#: 5342

CANADA
PROVINCE OF ONTARIO
PROVINCE DE L'ONTARIO
EAST REGION
(Region / Région)

Information of
Dénonciation de :
of      THE CITY OF KINGSTON                    PEACE OFFICER
de                                              (occupation / profession)

Patti Loyst #958

The informant says that he/she believes on reasonable grounds that
Le dénonciateur déclare qu'il a des motifs raisonnables de croire que

15-6933W

(1) FROUDE, Kenneth Wayne    DOB: 28 Jun. 1968
    PORTSMOUTH CCC 1455 BATH RD, KINGSTON, ON

COUNT 1

Kenneth Wayne FROUDE

on or about the 18th day of May in the year 2013 at the City of Kingston in the East
Region did, being required to be supervised by an order made under paragraph 753.1 (3)
(b) of the Criminal Code made by the Ontario Superior Court of Justice on May 16,
2008, for a period of ten years from his Warrant expiry date, pursuant to Section
753.1(3)(b) of the Criminal Code did, without reasonable excuse, fail or refuse to
comply with that order, namely to reside at a specific place - must reside at a
community correctional centre or a community-based residential facility approved by
the Correctional Service of Canada, contrary to Section 753.3, subsection (1) of the
Criminal Code of Canada.

COUNT 2 AND FURTHER THAT

Kenneth Wayne FROUDE

between the 18th day of May in the year 2013 and the 11th day of December in the year
2013 at the City of Kingston in the East Region did, being required to be supervised
by an order made under paragraph 753.1 (3) (b) of the Criminal Code made by the
Ontario Superior Court of Justice on May 16th, 2008, for a period of ten years from
his Warrant expiry date, pursuant to Section 753.1(3)(b) of the Criminal Code did,
without reasonable excuse, fail or refuse to comply with such order, namely remain at
all times in Canada within the territorial boundaries fixed by your parole supervisor,
contrary to Section 753.3, subsection (1) of the Criminal Code of Canada.

Continued....

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL
COPIE AUTHENTIQUE CERTIFÉE
ET CONFORME À L'ORIGINAL

RECORD CUSTODIAN
ONTARIO COURT OF JUSTICE
COUR DE JUSTICE DE L'ONTARIO

Locked Down Date: April 28, 2015 02:28 PM



COUNT 3 AND FURTHER THAT

Kenneth Wayne FROUDE

on or about the 18th day of May in the year 2013 at the City of Kingston in the East
Region did, being required to be supervised by an order made under paragraph 753.1 (3)
(b) of the Criminal Code made by the Ontario Superior Court of Justice on May 16th,
2008, for a period of ten years from his Warrant expiry date, pursuant to Section
753.1(3)(b) of the Criminal Code did, without reasonable excuse, fail or refuse to
comply with such order, namely obey the law and keep the peace, contrary to Section
753.3, subsection (1) of the Criminal Code of Canada.

COUNT 4 AND FURTHER THAT

Kenneth Wayne FROUDE

between the 18th day of May in the year 2013 and the 31st day of May in the year 2013
at the City of Kingston in the East Region did, having been served with a Notice Of
Obligation To Comply With Sex Offender Information Registration Act under Section
490.019 of the Criminal Code dated December 14th, 2005, fail, without reasonable
excuse, to comply with that notice by failing to report as required in the said
notice, contrary to Section 490.031, subsection (1) of the Criminal Code of Canada.

No. of Information / N° de la dénonciation
15-6933W

INFORMATION Against / DÉNONCIATION visant
FROUDE, Kenneth Wayne

Address / Adresse
PORTSMOUTH CCC 1455 BATH RD
KINGSTON, ON

Return Date / Date à laquelle le document est rapporté
, 20

CHARGE / ACCUSATION
FAIL TO COMPLY WITH LONG-TERM SUPERVISION ORDER
FAIL TO COMPLY WITH LONG-TERM SUPERVISION ORDER
FAIL TO COMPLY WITH LONG-TERM SUPERVISION ORDER
FAIL TO COMPLY WITH LONG-TERM SUPERVISION ORDER
refer to front page of information for remaining counts.
OCC#:13-14399

FOR ADMINISTRATIVE PURPOSES ONLY
A DES FINS ADMINISTRATIVES SEULEMENT

☐ Summons / Sommation
☐ Show Cause / Audience de Justification
☐ C.V.O.R. No (Commercial Vehicles Only) Numéro C.E.C.V.U. (véhicules utilitaires seulement)
☒ Warrant 1ʳ / Mandat en 1ʳ instance
☐ Re-laid Information / Dénonciation déposée de nouveau

Reportable M.V. Offence (H.T.A. 199) Infraction V.M. à déclarer (Code de la route 199)

Sex / Sexe: M
Birth Date / Date de naissance — Day / Jour 06, Month / Mois 28, Year / Année 1968

Was defendant owner? / La partie défenderesse était-elle propriétaire? ☐ Yes / Oui ☐ No / Non

Driver's License Number / Numéro du permis de conduire

Plate No. / Numéro de plaque   ☐ Involves a Collision / Infraction reliée à un accident

Date Sworn / Date d'assermentation   APR. 29 2015

Officer / Agent de police   No. / N° 953

Informant / Dénonciateur

Courtroom / Salle d'audience   Div.   Dist.
Room:

A.I. / A(au)

ONTARIO COURT OF JUSTICE
279 WELLINGTON ST., KINGSTON, ON

---

No. of Information / N° de la dénonciation

INFORMATION Against / DÉNONCIATION visant

Address / Adresse

Return Date / Date à laquelle le document est rapporté
, 20

CHARGE / ACCUSATION

FOR ADMINISTRATIVE PURPOSES ONLY
A DES FINS ADMINISTRATIVES SEULEMENT

☐ Summons / Sommation
☐ Show Cause / Audience de Justification
☐ C.V.O.R. No (Commercial Vehicles Only) Numéro C.E.C.V.U. (véhicules utilitaires seulement)
☐ Warrant 1ʳ / Mandat en 1ʳ instance
☐ Re-laid Information / Dénonciation déposée de nouveau

Reportable M.V. Offence (H.T.A. 199) Infraction V.M. à déclarer (Code de la route 199)

Sex / Sexe
Birth Date / Date de naissance — Day / Jour, Month / Mois, Year / Année

Was defendant owner? / La partie défenderesse était-elle propriétaire? ☐ Yes / Oui ☐ No / Non

Driver's License Number / Numéro du permis de conduire

Plate No. / Numéro de plaque   ☐ Involves a Collision / Infraction reliée à un accident

Date Sworn / Date d'assermentation

Officer / Agent de police   No. / N°

Informant / Dénonciateur

Courtroom / Salle d'audience   Div.   Dist.

A.I. / A(au)

---

No. of Information / N° de la dénonciation

INFORMATION Against / DÉNONCIATION visant

Address / Adresse

Return Date / Date à laquelle le document est rapporté
, 20

CHARGE / ACCUSATION

FOR ADMINISTRATIVE PURPOSES ONLY
A DES FINS ADMINISTRATIVES SEULEMENT

☐ Summons / Sommation
☐ Show Cause / Audience de Justification
☐ C.V.O.R. No (Commercial Vehicles Only) Numéro C.E.C.V.U. (véhicules utilitaires seulement)
☐ Warrant 1ʳ / Mandat en 1ʳ instance
☐ Re-laid Information / Dénonciation déposée de nouveau

Reportable M.V. Offence (H.T.A. 199) Infraction V.M. à déclarer (Code de la route 199)

Sex / Sexe
Birth Date / Date de naissance — Day / Jour, Month / Mois, Year / Année

Was defendant owner? / La partie défenderesse était-elle propriétaire? ☐ Yes / Oui ☐ No / Non

Driver's License Number / Numéro du permis de conduire

Plate No. / Numéro de plaque   ☐ Involves a Collision / Infraction reliée à un accident

Date Sworn / Date d'assermentation

Officer / Agent de police   No. / N°

Informant / Dénonciateur

Courtroom / Salle d'audience   Div.   Dist.

A.I. / A(au)



☐ Language Notification Issued / Langue de notification
☐ Interpreter / Interprète

## APPEARANCES – ADJOURNMENTS
## COMPARUTIONS – AJOURNEMENTS

**Page "A"**

| Date / Date | Accused / Accusé(e) | Adjournment / Ajournement | Parties Consent / Consentement des parties | Appearance Details / Détails de la comparution | Reason for Adjournment / Raison de l'ajournement | Counsel as Agent / Avocat(e) mandataire | Fails to Appear / Omet de comparaître | Bench Warrant / Mandat du tribunal | Discretion / Discrétion | Certificate of Default / Certificat de défaut |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| Date / Date | Clerk / Greffier | Reporter / Sténographe | For Crown / Pour la Couronne | For Accused / Pour l'accusé(e) | Justice's Initials / Initiales du juge |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Accused / Accusé(e)

Notice Given Under H.T.A.
Avis en vertu du Code de la route

☐ Suspension / Suspension    ☐ Impoundment / Mise en fourrière

**Accused / Accusé(e):**

515(9.1) Detained in custody primarily because of a previous conviction
Détention sous garde fondée principalement sur une condamnation antérieure
Yes / Oui ☐    No / Non ☐    Date / Date :

Confirmed and initialled by the Judge/Justice of the Peace in the appropriate box above /
Confirmé et paraphé par un(e) juge/juge de paix dans la case appropriée ci-haut

At the Bail Review dated:
Au moment de la révision du cautionnement, le :     , 515(9.1) was
, 515 (9.1) a été
☐ confirmed / confirmé    ☐ rescinded / révoqué    ☐ made (see application) / exécuté (voir la requête)

**Accused / Accusé(e):**

515(9.1) Detained in custody primarily because of a previous conviction
Détention sous garde fondée principalement sur une condamnation antérieure
Yes / Oui ☐    No / Non ☐    Date / Date :

Confirmed and initialled by the Judge/Justice of the Peace in the appropriate box above /
Confirmé et paraphé par un(e) juge/juge de paix dans la case appropriée ci-haut

At the Bail Review dated:
Au moment de la révision du cautionnement, le :     , 515(9.1) was
, 515 (9.1) a été
☐ confirmed / confirmé    ☐ rescinded / révoqué    ☐ made (see application) / exécuté (voir la requête)

**Accused / Accusé(e):**

515(9.1) Detained in custody primarily because of a previous conviction
Détention sous garde fondée principalement sur une condamnation antérieure
Yes / Oui ☐    No / Non ☐    Date / Date :

Confirmed and initialled by the Judge/Justice of the Peace in the appropriate box above /
Confirmé et paraphé par un(e) juge/juge de paix dans la case appropriée ci-haut

At the Bail Review dated:
Au moment de la révision du cautionnement, le :     , 515(9.1) was
, 515 (9.1) a été
☐ confirmed / confirmé    ☐ rescinded / révoqué    ☐ made (see application) / exécuté (voir la requête)

CCO-2-000-4 (rev. 09/13) CSD